UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AVONE LEACH,                                        :

                 Petitioner,          :          **MEMORANDUM DECISION**

          - v -                         :          18-CV-3427 (DC)

JAIFA COLLADO, Superintendent,          :

              Respondent.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APPEARANCES:          AVONE LEACH
                         Petitioner *Pro Se*
                         DIN 13-A-5173

                         ERIC GONZALEZ, Esq.
                         District Attorney, Kings County
                         By:     Jean M. Joyce, Esq.
                                  Assistant District Attorney
                         350 Jay Street
                         Brooklyn, NY  11201
                                  Attorney for Respondent

CHIN, Circuit Judge:

         In 2013, following a jury trial, petitioner Avone Leach was convicted in the

Supreme Court of the State of New York, Kings County (Dwyer, *J.*) of strangulation in

the second degree, criminal possession of a weapon in the third degree, and assault in

the third degree.  Dkt. 9-3 at 5.  On November 8, 2013, Leach was sentenced as a second

violent felony offender to a prison term of seven years followed by five years of post-

release supervision on the strangulation count, a consecutive prison term of two and

one-half to five years on the weapon possession count, and a one-year prison term on the assault count to run concurrently to the strangulation count. *Id.* at 22.[1] On March 30, 2016, the Appellate Division, Second Department, affirmed the convictions. *People v. Leach*, 30 N.Y.S.3d 117 (2d Dep't 2016) ("*Leach I*"). On August 16, 2016, leave to appeal to the New York Court of Appeals was denied. *People v. Leach*, 63 N.E.3d 80 (N.Y. 2016) (Garcia, J.) ("*Leach II*").

On September 11, 2018, proceeding *pro se,* Leach filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (the "Petition"). *See* Dkt. 6.[2] The Kings County District Attorney's Office filed its opposition to the Petition on November 19, 2018. *See* Dkt. 9. The matter has been fully submitted and undecided since then. The case was reassigned to the undersigned on May 12, 2023. Dkt. Sheet at 4.

For the reasons set forth below, Leach's petition is DENIED.

## STATEMENT OF THE CASE

### A.    *The Facts*

The evidence at trial established the following:

In April 2011, Danielle Laws ("Danielle") was in a relationship with Leach and had resided with him at 18 Macon Street in Brooklyn for eight months. Dkt. 9-1 at

---

[1]    Leach was conditionally released to parole on March 1, 2022. His post-release supervision maximum expiration date is November 11, 2026. *See* Incarcerated Lookup, Dep't of Corr. & Comm. Supervision, https://nysdoccslookup.doccs.ny.gov/.

[2]    Leach initially filed the Petition on June 7, 2018, but the Petition was unsigned and deemed a deficient filing. Dkt. 3. On August 1, 2018, the Court ordered Leach to file a signed petition. Dkt. 5. He did so on September 11, 2008. Dkt. 6.

425-27, 430.  Leach's mother, her boyfriend Lee Kelly, and Leach's uncle also resided in the house.  *Id.* at 459.

On April 24, 2011, Danielle, Leach, and Kelly were in the house when Danielle and Leach got into a heated argument.  *Id.* at 427, 429.  While Danielle was in the shower, Leach began to beat her with his fists.  *Id.* at 430.  The altercation went out into the living room, and Danielle asked Kelly for help.  *Id.* at 429.  Leach got on top of Danielle and strangled and released her over ten times, while calling her names and telling her she would die and leave the house in a body bag.  *Id.* at 443.  He also kicked and stomped on her and hit her in the head with a gun.  *Id.* at 513.  The strangling deprived her of oxygen.  *Id.* at 438.  She feared for her life, blacked out, and lost consciousness.  *Id.* at 443-44.

After regaining consciousness, Danielle tried to call 911, but Leach ripped the phone out of the wall.  *Id.* at 440.  Around 3:00 p.m., Danielle was able to call her brother Darald Laws ("Darald"), who had known Leach for over five years and had introduced Danielle to Leach.  *Id.* at 441, 473.  On the phone, Danielle was crying and upset, and Darald rushed over to get her.  *Id.* at 474.  When he arrived, he knocked on the door, and Leach opened the door and let Danielle out from behind him.  *Id.* at 474-75.  Darald observed that Danielle's nose was bloody, her face and cheeks were swollen, and her neck was bruised.  *Id.* at 476-77.  Darald intended to go home, but he drove Danielle to the 79th Precinct because Danielle wanted to file a report.  *Id.* at 476.  In the car, Danielle was sluggish, exhausted, "beat up and dizzy," and she repeatedly passed out.  *Id.* at 441, 478.

3

Around 4:00 p.m., Danielle spoke to Detective James Richardson and

Officer Richard Danese at the precinct.  *Id.* at 300-01, 511-12.  Officer Danese observed

that Danielle was "frantic," "shaking," "very sweaty," "stuttering," and "scared."  *Id.* at

300.  Detective Richardson testified that Danielle appeared as if she had been in a car

accident and that "[s]he had sort of ashen skin," "glassy eyes," and "a couple of small

abrasions, cuts, and scratches to her eye and her lip."  *Id.* at 512.  Danielle told the

officers that she was fighting with her boyfriend who she lived with, and he beat her

while she was in the shower, grabbed her, threw her on the ground, kicked, punched,

choked, and strangled her repeatedly, and hit her in the head with a gun.  *Id.* at 300-01,

513.  She told the officers that Leach had two guns in the house.  *Id.* at 531.  She also told

the officers that she had called her brother Darald, and he picked her up from the

house.  *Id.* at 514.  She recounted that when she and Darald were driving toward the

precinct, Leach followed them for a little bit and then turned back.  *Id.*

An ambulance arrived at the precinct and took Danielle to Woodhull

Hospital.  *Id.* at 331, 431.  Darald followed the ambulance, and the officers drove to 18

Macon Street to find Leach.  *Id.* at 477, 515.  When the officers arrived, Detective

Richardson got out of the vehicle and Leach ran inside the house and refused to open

the door.  *Id.* at 517, 518.  After calling for a supervisor to respond, Detective Richardson

ran to the side of the house and saw Leach come out of the back door and run back into

the house.  *Id.*  The sergeant arrived at the scene around 5:30 p.m. and persuaded Leach

to open the door, and Detective Richardson arrested him.  *Id.* at 304-05, 362-63, 518-19.

4

Detective Richardson searched Leach and found a small bag of marijuana in his pocket.  *Id.* at 519.  At that point, Detective Richardson heard Officer Danese say that someone else was inside the house.  *Id.* at 519-20.  Officer Danese observed the individual -- Kelly -- moving his hands from the couch to his pocket and waistband and instructed him to show his hands, but he did not comply.  *Id.* at 305-06.  Officer Danese entered the house and arrested Kelly.  *Id.* at 306.

While sitting in the police car, Leach told Detective Richardson that he slapped Danielle around but did not hurt or injure her.  *Id.* at 520.  Detective Richardson drove Leach and Kelly to the precinct, and Officer Danese stayed at the house to secure it until the officers could obtain and execute a search warrant.  *Id.* at 307, 521.

At Woodhull Hospital, Danielle was treated by Angelique Quinones, a registered nurse and expert in emergency medical care.  *Id.* at 564, 569-72.  Danielle reported that she had been pistol-whipped by her boyfriend, that she had lost consciousness and woke up feeling dizzy and nauseous, and that she had a headache, blurry vision, and sensitivity to light.  *Id.* at 577.  The medical assessment also recorded that Danielle had swelling around her eye, ringing in her ear, and temporary paralysis of her facial nerve.  *Id.* at 578-79.  Quinones testified that these symptoms were all consistent with head trauma, strangulation, and deprivation of oxygen to the brain.  *Id.* at 577, 579.  Danielle also had rib and neck pain and was given several tests and a neck brace.  *Id.* at 576, 583.

Around 11:15 p.m., officers returned to the house with a search warrant and, upon searching, recovered a black revolver and ammunition.  *Id.* at 309-10, 522-23.

Detective Richardson secured the revolver and the ammunition, vouchered it at the 79th Precinct, and sent it to the lab. *Id.* at 527. On April 25, 2011, Officer Paul Brown of the Evidence Collection Team photographed, swabbed, and dusted the revolver, and sent the gun and ammunition to the lab for analysis. *Id.* at 482, 487-89. A criminalist determined that Leach's DNA was on the revolver, and a forensics investigator determined that the revolver and ammunition were "operable." *Id.* at 505, 677.

Between April 25, 2011 and May 8, 2011, while at Rikers Island, Leach made 84 phone calls to various people. Dkt. 9-3 at 17. The phone calls were recorded. *Id.* In one phone call, Leach said, "I smacked my bitch and she went to the precinct and told on me." *Id.* In another phone call, he stated, "I slapped her three times." *Id.* at 18.

On April 27, 2011 -- four days after being admitted to Woodhull Hospital -- Danielle was discharged to a domestic violence shelter. Dkt. 9-1 at 584-85. On May 4, 2011, at a hospital visit, she reported that she was experiencing, among other things, headaches, ringing in her ears, blurry vision, light headedness, chest pain, nausea, and vomiting. *Id.* at 595. In June of 2011, she fainted on the street because of symptoms related to head trauma and strangulation. *Id.* at 588-89. At trial, she continued to have ringing in her ears, vertigo, nightmares, and memory problems. *Id.* at 429, 439.

B.    *Procedural History*

1.    *State Court Proceedings*

a.    *The Trial Court*

Leach was charged with strangulation in the second degree, attempted assault in the second degree, assault in the third degree, criminal obstruction of

6

breathing or blood circulation, criminal possession of a weapon in the third degree, and unlawful possession of marijuana.  Dkt. 9-3 at 7-8.

Trial commenced on September 3, 2013.  Dkt. 9-1 at 60.  The government's witnesses included Danielle, Darald, Officer Danese, Detective Richardson, Officer Brown, Detective James Morales, Tara Santore of the Office of the Chief Medical Examiner, who tested the revolver for DNA samples, Nurse Quinones, and Amy Lowe, the New York City Department of Corrections custodian of inmate records and recording.  Dkt. 9-1 at 298, 423, 472, 480, 496, 508, 564, 628 648.

During its direct examination of Danielle, the prosecution asked, "And what were you feeling as he was strangling you?"  *Id.* at 443.  The following exchange ensued among Danielle, defense counsel, and the court.

> [DANIELLE]: I seen my life flash.  I mean, I seen the room go from seeing the whole room to one corner turning black and then everything just gone.  And I don't know, I felt like he was just playing with my life.  I felt like he could see death in my face, because it's -- every time I thought that was my last breath, he would just let go and he just continued to do it and, you know, I don't know what made him stop, maybe he seen death in my eyes, but --
>
> [DEFENSE COUNSEL]:  Move to strike.
>
> THE COURT:  I will grant that motion.

*Id.*  In its summation, the prosecution referred to this testimony stating:

> The way she described it, page 172, line 15:  "I seen my life flash. I mean, I seen the room go from seeing the whole room to one corner turning black and then everything just gone.  And I don't know, I felt like he was just playing with my life."

> I submit to you, members of the jury, that was exactly what he was doing. He was playing with Danielle's life.  And that is intent to obstruct her breathing.

*Id.* at 746.  The prosecution made additional remarks during summation that are at issue:  The prosecution stated, "As the judge told you, that's a relatively new law, Strangulation.  That's the most intimate form of domestic violence.  That is the batterer showing the victim that he has ultimate power and control over her . . . ."  *Id.* at 745.  The prosecution also stated, "Two and a half years later, [Danielle] remains homeless, unable to work because of her injuries and dependent on her brother.  That's how well the system is working for Danielle."  *Id.* at 755.  When describing Detective Richardson's interaction with Danielle at the precinct, the prosecution stated that Detective Richardson did not simply write up a report and send Danielle on her way, but relied on his training as a former interrogator in the United States Marine Corps to question her, find out what happened, and assess her injuries.  *Id.* at 747-48.  Lastly, the prosecutor stated that Danielle had no reason to and did not exaggerate her testimony.  *Id.* at 733, 753.

On September 10, 2013, before the jury entered the courtroom, the following exchange took place among the court, the prosecutor, and defense counsel regarding the admission of two sets of medical records into evidence.

> [PROSECUTOR]:  Judge, before the jury comes in, I want to confirm before I call a witness I will be moving into evidence the two sets of medical records.
>
> THE COURT:  And we also have to tell them that the other exhibit, 1-A is fully in evidence.

8

> [DEFENSE COUNSEL]:  There are, in my opinion, some very serious redactions that need to be done.
>
> THE COURT:  And obviously, it will be subject to that.  I won't mention that to the jury yet.

*Id.* at 561-62.  After this exchange, the jury entered, and the court told the prosecution that it could call its next witness.  *Id.* at 562-63.  The prosecutor responded, "Yes, your Honor, before I call my next witness, I am asking that this be marked People's 7 for identification."  *Id.* at 563.  The court asked the prosecutor to describe the exhibit for the record, and she stated that it was a packet of "130 pages or so" of medical records from Woodhull Hospital.  *Id.*  The court responded, "It is People's 7.  Is there any objection?"  *Id.*  Defense counsel answered, "Judge, I have no objection to these records going in subject to any appropriate Court approved redactions."  *Id.*  The court responded, "Very well.  Then it is People's 7 in evidence, subject to potential reductions," and the Woodhull medical records were moved into evidence.  *Id.*  About 100 pages of medical records from Montefiore Medical Center were also moved into evidence, and the court noted that they were also in evidence "subject to potential redaction."  *Id.* at 563-64.  The record does not indicate that any redactions were ever made to the medical records.

On September 12, 2013, right after excusing the jury to begin its deliberations, the court asked, "May I assume if they send a note for the exhibits, we could send the exhibits in."  *Id.* at 784.  Defense counsel responded, "Yes."  *Id.*  During its deliberations, the jury sent out a note requesting all photos of Danielle and both sets of medical records, and the court provided the exhibits to the jury.  *Id.*  Shortly after, the jury reached its verdict.  *Id.*

9

The jury found Leach guilty of strangulation in the second degree, criminal possession of a weapon in the third degree, and assault in the third degree. Dkt. 9 at 2.  On November 8, 2013, Leach was sentenced as a second violent felony offender to seven years' imprisonment followed by five years of post-release supervision on the strangulation count, a consecutive two and one-half to five years' imprisonment on the weapon possession count, and one year imprisonment on the assault count to run concurrently with the strangulation count.  *Id.*

**b.**   *The Direct Appeal*

Represented by counsel, Leach appealed to the Appellate Division, Second Department, on August 11, 2015.  Dkt. 9-2.  Leach's appellate counsel argued that (1) Danielle's hearsay statements to officers were not excited utterances; (2) Leach's constitutional right to confrontation was violated when the jury had access to an unredacted version of the medical records that included Danielle's allegations of prior abuse; (3) Nurse Quinones was not qualified to give opinion testimony on whether strangulation caused Danielle's injuries; (4) the prosecutor engaged in multiple procedural errors in summation; (5) there was insufficient evidence to support a guilty verdict on the strangulation count, and alternatively, the verdict was against the weight of the evidence; and (6) trial counsel failed to provide Leach with meaningful representation.  *Id.* at 3-4.

On March 30, 2016, the Second Department affirmed Leach's convictions. *Leach I,* 30 N.Y.S.3d at 119.  The court held that the statements Danielle made to police officers at the precinct were improperly admitted as excited utterances because of the

10

time lapse between the incident and the statements, her condition when she arrived at the precinct, and her coherent responses to questions asked. *Id.* The court concluded, however, that the error was harmless in light of the overwhelming evidence of Leach's guilt. *Id.* As to the confrontation issue, the court held that the contention was unpreserved for appellate review but that, in any event, there was no deprivation of the defendant's right to confrontation because Danielle testified at trial, and moreover, the unredacted portions of the medical records were relevant to diagnosis and treatment. *Id.* at 119-20. The court held that Quinones was properly qualified as an expert in emergency medical care, and her testimony did not go beyond her training, education, knowledge, or experience. *Id.*

Regarding the procedural errors in the prosecutor's summation, the court held that the issue was unpreserved for appellate review, but that, in any event, some of the challenged statements were permissible and others that were impermissible "were not so flagrant or pervasive so as to deprive the defendant of a fair trial." *Id.* at 120. Similarly, as to the sufficiency-of-the-evidence contention for the strangulation court, the court held that it was unpreserved for appellate review but that, in any event, the verdict was sufficient and not against the weight of the evidence. *Id.* Finally, the court held that Leach was not deprived of the effective assistance of counsel. *Id.* at 121.

Leach sought leave to appeal to the Court of Appeals, raising all six claims, and the court denied leave. *Leach II*, 63 N.E.3d 80.

11

2. *Proceedings Below*

On September 11, 2018, proceeding *pro se*, Leach filed the Petition raising the same six claims that he raised on appeal to the Second Department:   (1) his confrontation rights were violated when the jury had access to unredacted portions of Danielle's medical records that included allegations of prior abuse; (2) the prosecutor committed several errors during summation; (3) there was insufficient evidence to find him guilty of strangulation; (4) he received ineffective assistance of trial counsel; (5) Danielle's statements to the officers at the precinct were improperly admitted as excited utterances; and (6) Quinones was improperly admitted as an expert in emergency medicine and was not qualified to testify about whether strangulation caused Danielle's injuries.  Dkt. 6 at 5-10.

The District Attorney's Office filed an affidavit and a memorandum of law in opposition to the Petition on November 19, 2018.  Dkt. 9.  On November 28, 2018, Leach submitted a letter to the Court requesting that his Petition be granted.  Dkt. 10. On December 17, 2018, Leach submitted a letter to the Court replying to the Respondent's opposition, which the Court accepted.  Dkt. 11; Docket Sheet at 4.  On October 25, 2019, Leach wrote to the Court requesting an update on the status of the case.  Dkt. 12.  On October 29, 2019, the Court informed Leach that his petition was pending before the Court.  Docket Sheet at 4.  The case was reassigned to the undersigned on May 12, 2023.

12

*DISCUSSION*

**A.**   *Federal Review of State Convictions*

A federal court may not grant a habeas petition on a claim that was adjudicated on the merits in state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see Harrington v. Richter*, 562 U.S. 86, 97-98 (2011); *Waiters v. Lee*, 857 F.3d 466, 477 (2d Cir. 2017).  Hence, when a claim is adjudicated on the merits, the state court's decision must be accorded "substantial deference."  *Fischer v. Smith*, 780 F.3d 556, 560 (2d Cir. 2015).  "A federal court may reverse a state court ruling only where it was 'so lacking in justification that there was . . . [no] possibility for fairminded disagreement.'"  *Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012) (per curiam) (quoting *Harrington*, 562 U.S. at 103); *see also Wetzel v. Lambert*, 565 U.S. 520, 524 (2012) (per curiam).

"The Confrontation Clause of the Sixth Amendment, which applies to the states through the Fourteenth Amendment, guarantees the defendant in a criminal prosecution the right to confront the witnesses against him."  *Henry v. Speckard*, 22 F.3d 1209, 1214 (2d Cir. 1994) (internal citation omitted).  The essential purpose of the Confrontation Clause is to give the defendant the opportunity to cross-examine witnesses.  *Id.*  Thus, it bars the "admission of testimonial statements

of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).  Furthermore, "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." *Id.* at 59 n.9.  A statement is testimonial and triggers the protections of the Confrontation Clause if it was "made with the primary purpose of creating a record for use at a later criminal trial." *United States v. James*, 712 F.3d 79, 96 (2d Cir. 2013).

By their nature, certain statements are not testimonial because they are "made for a purpose other than use in a prosecution." *Michigan v. Bryant*, 562 U.S. 344, 362 n.9 (2011).  Such statements include statements made for the purpose of medical diagnosis or treatment and excited utterances.  *See* Fed. R. Evid. 803(2), (4). "[S]tatements made for the purposes of medical diagnosis or treatment, including medical history, and a description of symptoms and pain, are admissible under the exception to the hearsay rule set forth in Rule 803(4)," *Turner v. White*, 443 F. Supp. 2d 288, 297 (E.D.N.Y. 2005), and out-of-court statements related to a startling event and made "while the declarant was under the stress of excitement" are admissible as excited utterances, Fed. R. Evid. 803(2); *see also People v. Johnson*, 804 N.E.2d 402, 405 (N.Y. 2003) ("An out-of-court statement is properly admissible under the excited utterance exception when made under the stress of excitement caused by an external event, and not the product of studied reflection and possible fabrication.").  "The erroneous admission of evidence rises to a deprivation of due process under the

14

Fourteenth Amendment only if the evidence in question was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992) (internal quotation marks and citation omitted).

To grant relief for a claim of prosecutorial misconduct, the reviewing court has to find that "the prosecutor's comments constituted more than mere trial error, and were instead so egregious as to violate the defendant's due process rights." *Tankleff v. Senkowski,* 135 F.3d 235, 252 (2d Cir. 1998).  The petitioner must show "that he suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict." *Id.* (citation omitted).  Furthermore, "[i]t is well-settled that both the prosecution and defense are entitled to broad latitude in the inferences they may suggest to the jury during closing arguments, provided they do not misstate the evidence, refer to facts not in evidence, or express counsel's personal belief as to guilt or innocence." *United States v. Smith*, 778 F.2d 925, 929 (2d Cir. 1985) (internal quotation marks and citation omitted).  "While the prosecution may not vouch for the credibility of its witnesses, the government is allowed to respond to an argument that impugns its integrity or the integrity of its case . . . ." *United States v. Carr*, 424 F.3d 213, 227 (2d Cir. 2005) (internal quotation marks and citation omitted).

Defendants in a criminal trial may be convicted only upon proof establishing their guilt beyond a reasonable doubt.  *See Jackson v. Virginia*, 443 U.S. 307, 323 (1979).  When reviewing a claim that the evidence introduced at trial was

15

insufficient to sustain a defendant's conviction, the reviewing court applies the

standard set forth in *Jackson* to determine "whether, after viewing the evidence in the

light most favorable to the prosecution, *any* rational trier of fact could have found

the essential elements of the crime beyond a reasonable doubt." *Id.* at 318-19. In

doing so, the court defers to the jury's assessments on both "the weight of the

evidence [and] the credibility of witnesses." *Maldonado v. Scully*, 86 F.3d 32, 35 (2d

Cir. 1996). Furthermore, the court "must look to state law to determine the elements

of the crime." *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002). A "petitioner

bears a very heavy burden in convincing a federal habeas court to grant a petition on

the grounds of insufficient evidence." *Id*. (internal quotation marks and citation

omitted). Indeed, a federal court may overturn a state court decision rejecting a

sufficiency of the evidence challenge only if the state court decision was "objectively

unreasonable." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (internal quotation marks

and citation omitted).

    Additionally, in general, to prevail on a claim of ineffective assistance

under federal law, a petitioner must (1) show that counsel's performance was so

deficient as to fall below "an objective standard of reasonableness"; and (2) establish

prejudice by demonstrating a "reasonable probability" that, "but for counsel's

unprofessional errors, the result of the proceeding would have been different."

*Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). In the context of a habeas

petition pursuant to 28 U.S.C. § 2254, "[e]stablishing that a state court's application of

*Strickland* was unreasonable . . . is all the more difficult. The standards created by

16

*Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (citations omitted). Therefore, "[t]he operative question" when a federal court reviews "a state court's *Strickland* ruling is thus not whether [the] federal court believes the state court's determination was incorrect, but rather whether that determination was objectively unreasonable -- a substantially higher threshold." *Waiters*, 857 F.3d at 478 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)) (cleaned up). The standard to establish an ineffective assistance of counsel claim under New York law is lower than under federal law. *See People v. Honghirun*, 78 N.E.3d 804, 807 (N.Y. 2017). In New York, a defendant must show only "that counsel failed to provide meaningful representation." *People v. Alvarez*, 125 N.E.3d 117, 120 (N.Y. 2019) (citing *People v. Stultz*, 810 N.E.2d 883 (N.Y. 2004); *People v. Baldi*, 429 N.E.2d 400 (N.Y. 1981)). Unlike the federal standard, *see Strickland*, 466 U.S. at 694, under the state standard, the defendant is not required to demonstrate that he was prejudiced by the ineffective assistance, *see Alvarez*, 125 N.E.3d at 120.

Finally, a state law error is not sufficient for habeas corpus relief unless it rises to a level that implicates a federal constitutional right. *Wainwright v. Goode*, 464 U.S. 78, 86 (1983) (per curiam). Such error does not rise to the level of a constitutional violation unless the petitioner can demonstrate that the error had a "substantial and injurious effect or influence" on the jury's verdict. *Headley v. Tilghman*, 53 F.3d 472, 474 (2d Cir. 1995) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). Under New York law, "[t]he admissibility and bounds of expert

17

testimony are addressed primarily to the sound discretion of the trial court." *People v. Cronin*, 458 N.E.2d 351, 352 (N.Y. 1983). "The Federal Rules of Evidence permit opinion testimony by experts when the witness is 'qualified as an expert by knowledge, skill, experience, training, or education . . . .'" *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042 (2d Cir. 1995) (quoting Fed. R. Evid. 702).

**B.    *Analysis***

Leach asserts six claims in the Petition:  (1) his confrontation rights were violated when the jury had access to unredacted portions the medical records; (2) the prosecutor committed several errors during summation; (3) there was insufficient evidence to find him guilty of strangulation; (4) he received ineffective assistance of trial counsel; (5) Danielle's statements to the officers at the precinct were improperly admitted as excited utterances; and (6) Quinones was improperly admitted as an expert in emergency medicine and was not qualified to give certain opinion testimony.  Dkt. 6 at 5-10.  First, I address the claims that are procedurally barred, and then I address the merits of the claims in turn.

**1.    *The Procedural Bars***

If a state court's decision regarding a claim "rests on a state law ground that is independent of the federal question and adequate to support the judgment," the claim is procedurally barred, whether the state-law ground is substantive or procedural.  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991); *accord Bierenbaum v. Graham*, 607 F.3d 36, 47 (2d Cir. 2010).  The Second Circuit has "held repeatedly that [New York's] contemporaneous objection rule" -- that state appellate courts will

18

review only those errors of law that are presented contemporaneously such that the trial court is "reasonably prompted" to correct them -- "is a firmly established and regularly followed New York procedural rule." *Downs v. Lape*, 657 F.3d 97, 103, 104 (2d Cir. 2011) (citations omitted). Hence, the Circuit has affirmed the denial of habeas relief based on the Appellate Division's ruling that a claim is unpreserved for appellate review pursuant to the contemporaneous objection rule. *See, e.g., Garcia v. Lewis*, 188 F.3d 71, 81-82 (2d Cir. 1999).

If a claim is procedurally barred pursuant to an independent and adequate state rule, a federal habeas court may not review it on the merits, unless the petitioner demonstrates (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law," or (2) "that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. The Appellate Division, citing the contemporaneous objection rule, concluded that three of Leach's claims were unpreserved for appellate review -- the Confrontation Clause claim, the prosecutorial misconduct claim, and the sufficiency of the evidence claim. *Leach I*, 30 N.Y.S.3d at 119-20 (citing N.Y. Crim. Proc. Law § 470.05(2) (McKinney)). The Appellate Division's determination bars this Court from reviewing the merits of the claim. *See Cone v. Bell*, 556 U.S. 449, 465 (2009). Furthermore, Leach has not demonstrated cause for the default or shown that failure to consider the claims will result in a fundamental miscarriage of justice, for, as discussed below, I agree with the Appellate Division that the claims are meritless in any event.

19

2.    *The Merits*

The state court rejected all six of Leach's claims on the merits, and thus

those decisions are entitled to "substantial deference."  *Fischer*, 780 F.3d at 560.  As

discussed below, I cannot agree that the rulings were "so lacking in justification that

there was . . . [no] possibility for fairminded disagreement."  *Vega*, 669 F.3d at 126

(internal quotation marks and citation omitted).  Leach has also not shown that the state

court's determination on the merits was contrary to or involved an unreasonable

application of clearly established federal law.  28 U.S.C. § 2254(d)(1).  Thus, I conclude

that all six claims fail.

a.  *The Confrontation Clause Claim*

For his first claim, Leach argues that his rights under the Confrontation

Clause were violated because during deliberations the jury received unredacted

medical records, which contained statements regarding uncharged instances of

Leach's violence toward Danielle.  Dkt. 6 at 5.  In his brief to the Appellate Division,

Leach alleged that "the medical records contained, at a minimum, three highly

prejudicial references to 'history of abuse' that went to appellant's propensity to

commit strangulation."  Dkt. 9-2 at 36.  Leach described the statements as follows:

> First, [complainant] report[ed] one past hospitalization during which
> time she lied and blamed a facial laceration on her nephew . . . ."
> (People's Ex. 7)  Second, [complainant] report[ed] that [appellant] was
> physically abusive throughout the relationship but never to the extent
> of the current incident.  (*Id.*)  Third, under 'Social History,' complainant
> reported that her relationship with appellant included a history of
> verbal and physical abuse.  (Peoples Ex. 8)

*Id.* (internal quotation marks omitted).  Danielle, however, testified at trial and was cross-examined by defense counsel, and the Supreme Court has held that where a declarant is present for cross-examination, the Confrontation Clause does not restrain the use of prior testimonial statements.  *See Crawford*, 541 U.S. 59 n.9.  What is more, the statements in the medical records were not testimonial because they were made for the purpose of medical diagnosis or treatment.  *See People v. Ortega*, 942 N.E.2d 210, 214 (N.Y. 2010).  Therefore, the Confrontation Clause claim fails on the merits.

### b.  *The Prosecutorial Misconduct Claim*

For his second claim, Leach contends that the prosecutor committed several errors during summation:  (1) repeatedly quoting stricken testimony, Dkt. 6 at 6; (2) personally vouching for Danielle's credibility and using Officer Richardson's training to make him an "honesty expert" and bolster Danielle's testimony, *id.*; and (3) making inflammatory arguments regarding "the system" and "domestic violence," *id.*; *see also* Dkt. 9-1 at 745, 755.

First, regarding the stricken testimony, I infer from the record that the court struck the portion of Danielle's testimony in which she surmised that Leach could "see death in her face" or "see death in her eyes" while he was choking her.  Dkt. 9-1 at 443.  Indeed, during summation when the prosecutor quoted Danielle's statements about seeing her life flash and feeling like Leach was playing with life, defense counsel did not object.  *Id.* at 746.  Because the prosecutor quoted directly from Danielle's testimony, which it had broad latitude to do during summation, it cannot be said that

21

the comment was sufficiently egregious so as to violate Leach's constitutional rights.
*See Smith*, 778 F.2d at 929; *Tankleff*, 135 F.3d at 252.

Second, the prosecutor neither vouched for Danielle's credibility nor used Officer Richardson's training to bolster Danielle's testimony.  Throughout the opening, cross-examination, and summation, defense counsel's statements and questions suggested that Danielle had lied and "overstated" or "overblown" the incident.  *See* Dkt. 9-1 at 297.  For example, during summation defense counsel stated:

> And I am telling you, folks, that this case is predicated on her lying one time after another.  And just because Ms. Laws continues to say it's so a number of times, to first the cop, then an EMT, then a nurse, then a doctor and telling the same story to the nurses and doctor for four days and then again six weeks later in a different hospital doesn't make it true.  And if it's not true, I submit to you, folks, it cannot form the basis of proper proof to support the conviction.

*Id.* at 712.  The prosecutor was allowed to respond to defense counsel's arguments about Danielle's credibility.  *See Carr*, 424 F.3d at 227.  Moreover, the prosecutor's comments about Officer Richardson's drawing on prior training were not inappropriate, much less egregious.

Third, the prosecutor's comment that "the system" was not working for Danielle did not improperly prejudice the jury as Leach claims, but was responsive to defense counsel's suggestion that she "concoct[ed] a story" because was she was "pissed as all hell" at Leach  *Id.* at 716, 755.  The prosecutor's description of the strangulation as "the most intimate form of domestic violence" because it allows the batterer to assert control also did not prejudice the jury's deliberations.  *Id.* at 745.  As

Leach has not shown that any of the prosecutor's comments unfairly influenced the jury's determination, his prosecutorial misconduct claim also fails.

Finally, as discussed below, the evidence of Leach's guilt was overwhelming, and Leach has not shown that there is a reasonable possibility of actual prejudice.

### c.  *The Sufficiency of the Evidence Claim*

For his third claim, Leach argues that there was insufficient evidence for the jury to find him guilty of strangulation because the medical records contained no mention of strangulation, the follow-up medical records only contained one mention of strangulation, and Danielle's testimony was not credible and "failed to link obstruction to any injury." Dkt. 6 at 8.  Under New York law, "[a] person is guilty of strangulation in the second degree when he or she commits the crime of criminal obstruction of breathing . . . and thereby causes stupor, loss of consciousness for any period of time, or any other physical injury or impairment. " N.Y. Penal Law § 121.12 (McKinney).

The evidence established that Leach got on top of Danielle and strangled her several times causing her to lose consciousness and experience dizziness.  *See* Dkt. 9-1 at 441, 443-44.  The evidence also established that her neck was bruised, she had neck pain, and she had to wear a neck brace.  *See id.* at 476-77, 576, 583.  Additionally, she had symptoms that were all consistent with strangulation and oxygen deprivation to the brain.  *See id.* at 577, 579.  The evidence was more than sufficient to establish that Leach obstructed Danielle's breathing and

23

thereby caused physical injury.  In addition to Danielle's testimony, her injuries were

corroborated by the medical records as well as by the testimony of numerous

witnesses.  And Leach himself admitted that he attacked Danielle.  *Id*. at 520.

Therefore, viewing the evidence in the light most favorable to the prosecution, the

jury reasonably found that the essential elements of the crime were met, *Jackson*, 443

U.S. at 318-19, and the Appellate Division's rejection of the claim was not "objectively

unreasonable," *Coleman*, 566 U.S. at 651.  Accordingly, Leach's third claim fails as

well.

### d.  *The Ineffective Assistance of Counsel Claim*

       For his fourth claim, Leach contends that trial counsel provided

ineffective assistance of counsel because he failed to object to the prosecutor's

prejudicial comments in summation, failed to follow up on the redactions to the

medical records, and failed to make a specific motion to dismiss.  Dkt. 6 at 9.  This

claim fails, for Leach has not established that counsel's performance fell below an

objective standard of reasonableness and that but for counsel's errors the jury's

verdict would have been different.  *See Strickland*, 466 U.S. at 694.  Because of the

overwhelming evidence on which the jury could rely to determine Leach's guilt, it

cannot be said that but for counsel's objecting to the prosecution's comments or

making a motion to dismiss, the proceeding would have been different.

Furthermore, it is unclear whether the medical records were ever redacted, but even

if the jury had access to certain unredacted statements in the medical records, those

statements were not testimonial and were not substantially different from Danielle's

testimony.  *See Michigan*, 562 U.S. at 362 n.9; *Turner*, 443 F. Supp. 2d at 297.  The

Appellate Division concluded that "viewing counsel's representation in its totality . .

. the defendant was not deprived of the effective assistance of counsel."  *Leach I*, 30

N.Y.S.3d at 121.  The Appellate Division's ruling is not objectively unreasonable.

Accordingly, there was no error of constitutional magnitude, and Leach's fourth

claim fails.

### e.  *The Hearsay Claim*

For his fifth claim, Leach argues that the court erred by admitting

Danielle's statements to the officers as excited utterances, thus depriving him of due

process.  Dkt. 6 at 10.  Specifically, Leach states that "[t]he admission of the statements

were prejudicial, as there was no overwhelming evidence in this case."  *Id.*  As the

Appellate Division held, here, given the other evidence, including Danielle and Darald's

testimony, the nurse's testimony, the medical records, and Leach's statements on the

recorded phone calls, it cannot be said that Danielle's statements to the officers were

sufficiently material to provide the basis for Leach's conviction.  *See Johnson*, 955 F.2d at

181.  Moreover, Danielle testified on direct examination about the same things she told

the officers at the precinct.  Therefore, the admission of the statements did not violate

due process, and this claim also fails.

### f.  *The Opinion Testimony Claim*

For his sixth claim, Leach argues that the court erred in admitting

Quinones as an expert in emergency medicine because she "was not qualified to give

opinion testimony on whether strangulation caused [Danielle's] injuries," and "[h]er

skill, training, education, experience and knowledge related to documenting injuries, not their diagnosis." Dkt. 6 at 10.  The Appellate Division rejected this argument, holding that Quinones "was properly qualified as an expert in the field of emergency medical care, and her testimony did not go beyond her training, education, knowledge, or experience." *Leach I*, 30 N.Y.S.3d at 120.  On direct examination, Quinones stated that as a registered nurse for six years, she had treated "hundreds" of patients for domestic violence and strangulation injuries and "thousands" of patients for loss of consciousness.  Dkt. 9-1 at 569.  The court qualified her as an expert and instructed the jury to give her testimony the weight they thought it deserved.  *Id*. at 572.  The court was well within its discretion to do so because Quinones's testimony was based on her experience as a nurse and her treatment of Danielle.  There was no constitutional violation and thus Leach's sixth claim provides no basis for habeas relief.

## *CONCLUSION*

Leach has failed to show any basis for relief under 28 U.S.C. § 2254. Accordingly, the Petition is denied.  Additionally, I decline to issue a certificate of appealability because Leach has not made a substantial showing of the denial of a constitutional right.  *See* 28 U.S.C. § 2253.  Pursuant to 28 U.S.C. § 1915(a)(3), I certify that any appeal taken from this decision and order would not be taken in good faith.

The Clerk of the Court shall enter judgment accordingly and close this case.  As Leach has been released on supervision, the District Attorney shall obtain

Leach's current address from the agency supervising Leach and mail copies of this

memorandum decision and the judgment to Leach at that address forthwith.

             SO ORDERED.

Dated:       New York, New York
                 June 22, 2023

                                _____s/DC_____
                                DENNY CHIN
                                United States Circuit Judge
                                Sitting By Designation